## PITTSBURGH PLATE GLASS CO. v. AMERICAN WINDOW GLASS CO.

(District Court, W. D. Pennsylvania. May Term, 1919.)

No. 248.

1. Patents ⟾112(3)—Patent Office decisions reinforce presumption of validity.

The legal presumption of validity of a patent is strengthened by decisions of successive tribunals of the Patent Office sustaining it on contested interference proceedings.

2. Patents ⟾62—Oral testimony held insufficient to establish prior use.

Oral testimony of witnesses speaking from their recollection of a brief experiment made ten years previously, and unsupported by any record or exhibit evidence, held insufficient to establish prior use.

3. Patents ⟾120—Essentials of double patenting stated.

While an inventor may not sustain a subsequent patent for an invention actually claimed and secured in a prior patent nor for an essential element of an invention secured by a former patent, without which that invention would not have been patentable, the maker of several patentable inventions resulting in a new and useful machine or process may at his option secure all these inventions by a single patent or each patentable invention by a separate patent, and the fact that he may describe all of them in an application for an earlier patent to secure one of them does not invalidate a subsequent patent to him for those inventions therein described but not claimed.

4. Patents ⟾328—1,208,851, claims 1-4, for method of drawing glass cylinders, held valid, but not infringed.

The Spinasse patent, No. 1,208,851, claims 1-4, for a method of drawing glass cylinders by the use of a cold bait, held valid against the defenses of anticipation and double patenting, but not infringed.

In Equity. Suit by the Pittsburgh Plate Glass Company against the American Window Glass Company. Decree for defendant.

Decree affirmed 276 Fed. 849. See, also, 276 Fed. 193.

Marshal A. Christy and James C. Bradley, both of Pittsburgh, Pa., for plaintiff.

Bakewell, Byrnes & Stebbins, of Pittsburgh, Pa., for defendant.

THOMSON, District Judge. In this action, infringement by the defendant is charged of four claims of patent No. 1,208,851, granted to the plaintiff as assignee of A. E. Spinasse, the inventor. The case presents a voluminous record, a history of proceedings in the Patent Office protracted and somewhat involved, and a number of complicated questions of law and fact, more or less relevant to the issue here. But by keeping in mind certain well-established legal principles which control these questions, I think the ultimate solution is not difficult.

The broad subject-matter involved is that of cold baits, but the claims in issue are method claims. The patent does not cover the drawing implement known as a cold bait, but a method of using the cold bait by which a certain result is secured. That is to say, a novel supported upon a bait without fusion, with such relative formation of the novel and bait that there is an assured capability of relative

⟾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

movement of the glass novel upon the bait, so that rupturing pressures are avoided during the drawing operation.

Admittedly, both plaintiff and defendant use a cold bait. By this term we mean, generally speaking, a bait used at a temperature below that at which the glass will fuse with the metal of the bait. This fusion, with the resulting firm adhesion of the glass to the bait, is the principle on which cylinders are drawn by the hot bait method. Where the temperature is so low that no fusion of the metals occurs, another lifting or drawing method was introduced; that is, when the bait is immersed in the glass, the glass flows over some form of ledge or groove, usually in the interior of the bait, and by the chilling action of the bait thereon, a supporting head or novel is formed of sufficient strength to draw the cylinder.

The plaintiff claims infringement, because the defendant draws glass cylinders from a body of glass with a metal bait, having its bottom open and its interior thereabove of larger dimensions than the opening, and when immersed in the bath, the glass flows upward into the enlarged interior, where it is chilled by the relatively low temperature of the bait, the glass within the bait supporting the cylinder as it is drawn, and being free to shrink radially toward the center of the bait.

The defendant denies the validity of the claims in suit, in view of the prior patents of Raspillaire and Spinasse; because of double patenting; and because of the prior invention and use of Mambourg, whose cold bait Spinasse saw in 1908, and from which he acquired and appropriated the claims in issue; and further that, if the claims in suit be held valid, defendant has not infringed them.

While the first four claims of the patent are in issue, the case can be disposed of by a consideration of the first claim. This claim is as follows:

"The herein described method of drawing glass cylinders from a body of glass with a metal bait having its bottom open and its interior thereabove of a larger diameter than the opening, which consists in maintaining the bait at a temperature to chill the glass, immersing the bait while at such temperature to such a depth as to permit the glass to flow upward into the enlarged interior where it is chilled by the relatively low temperature of the bait, and then raising the bait supporting the cylinder as it is drawn by the glass within the bait and applying air pressure to its interior, with the glass upon the interior of the bait supported free to shrink radially toward the center of the bait."

This claim was involved in an issue of interference in the Patent Office between Slingluff, Sweet, and Spinasse, and was heard before the primary examiner, by the examiner of interferences on final hearing, and on appeal by the board of examiners in chief, the Commissioner of Patents, and the Court of Appeals. Each of these tribunals awarded priority of invention to Spinasse in opinions filed. Sweet moved to dissolve on the ground that the issue was not patentable to any of the parties, in view of patents 834,165 and 839,421 to Raspillaire, and two prior patents, 915,899 and 921,747, to Spinasse. After fully considering the references relied on by Sweet, the issue was held patentable over them, and the motion of Sweet denied.

During the progress of the interference, the Commissioner, in view of certain affidavits filed, granted permission to Sweet's assignee to take testimony to demonstrate the operativeness of the Raspillaire device. Such testimony was accordingly taken and passed upon. It would unduly extend this opinion to quote from the opinions of these patent tribunals, each of which bears evidence of clear discernment and painstaking consideration of the questions involved. In substance, however, it was held as to the Spinasse patents that they provide for the use of hot baits, and were therefore not applicable. It was held as to Raspillaire that although it is stated in Patent No. 839,421 that the bait when dipped into the molten glass is cool, or comparatively so, nothing is found in it, or in either of his other patents, which is regarded as a disclosure of the method defined in the issue of interference. It is further held as to the last-named patents of Raspillaire that there was nothing to indicate as a feature of the invention, that it was intended to dispense with the initial heating of the bait, a step regarded at that time as essential in the art, or that it was intended that the bait described should be used without the former.

[1] In addition to the legal presumption of validity which exists in favor of the patent in suit, this presumption is greatly strengthened by the decision of the successive Patent Office tribunals. The presumption is by no means so strong where the proceeding is ex parte, with no opportunity to be heard by a party adversely interested. On the other hand, it is greatly enhanced and reinforced, where, as here, the conclusion is reached after a full hearing and a heated contest followed through all the tribunals.

In harmony with the views of the Patent Office, I find that the claims of the patent in suit are valid over the prior art patents of Raspillaire and Spinasse.

In the case of Window Glass Machine Co. et al. v. Pittsburgh Window Glass Co., 276 Fed. 193, in an opinion herewith filed, I held the Raspillaire device for drawing and shaping glass articles by means of a bait and former, where no distending air is used, the glass being shaped solely by the former, to be wholly inoperative; that the patent does not teach the use of the bait dissociated from the former, but was a special drawing implement for a special purpose definitely disclosed. The same reasoning would apply to the other two patents of Raspillaire, to which reference has been made. I think this conclusion is entirely supported by the tests introduced by the respective parties in relation to the device of Raspillaire. In those tests, where success in drawing a cylinder was obtained, it was solely because the cylinder was shaped by air distension and not by a former; in other words, because the shaping method disclosed by Raspillaire was wholly ignored. It must be kept in mind that Raspillaire, in all his patents, disclosed a machine in which the shape of the draw could be varied at will by the shape of the former; this element being distinctly substituted for shaping by air distension. In any test where air was in fact used for distension instead of for chilling purposes, or for so-called lubrication, it was a use wholly

unwarranted by any disclosure of Raspillaire's. The defense of invalidity by reason of the prior art cannot be sustained.

[2] Nor can I find invalidity from the alleged actual use of the patented invention by Mambourg prior to the date of Spinasse's invention, and public use thereof by him more than two years prior to Spinasse's application, or that the invention was that of Mambourg, from whom Spinasse derived his knowledge. I have examined and considered with care the testimony on this subject, which is both voluminous and contradictory. The testimony of Mambourg himself was so inconsistent with many well-established facts as to raise very grave doubts as to his truthfulness. His course of conduct in 1911, when, less than three years after he claims to have himself made the invention, he voluntarily acts as agent in endeavoring to sell Spinasse's invention to the American Window Glass Company, and wholly failing to disclose to that company any claim of his own thereto, further greatly detracts from the credibility of his testimony. I cannot stop to discuss the evidence in detail. The alleged facts sought to be shown by the defense are so narrow and elusive that observation and recollection might well be at fault. The witnesses were speaking of occurrences ten years before, as to casual observations, all concerning a brief experiment, all the evidences of which are lost or forgotten, and of which no tools, machinery, drawings, or contemporaneous records remain. The burden rests heavily on the defendant to satisfy the court of the facts which it asserts. The inaccuracy of observation, the forgetfulness of witnesses, their liability to mistake, their tendency to shape their evidence in sympathy with the eagerness of interested parties, aside from the temptation to actual falsehood, all go to place such testimony in the doubtful class. As the Supreme Court said in Deering v. Harvester Works, 155 U. S. 288, 15 Sup. Ct. 123, 39 L. Ed. 153:

"Oral testimony, unsupported by patents or exhibits, tending to show prior use of a device regularly patented, is, in the nature of the case, open to grave suspicion."

Authorities to the same effect are so abundant that the proposition is no longer open to question. The testimony here is very unsatisfactory. It falls far short of that high measure of proof which, in these circumstances, all the authorities agree should be applied. This defense must therefore fail.

[3] Nor do I believe, although the question is close, that the patent is void for double patenting. Of course, the real question is the identity of the invention, and not the question of phraseology by which that invention is disclosed. As was held in Century Electric Co. v. Westinghouse Co., 191 Fed. 350, 112 C. C. A. 8, an inventor may not sustain a subsequent patent for an invention actually claimed and secured in a former patent, nor for an essential element of an invention secured by a former patent, without which that invention would not have been patentable. But the maker of several patentable inventions resulting in a new and useful machine or process may at his option secure all these inventions by a single patent, or each pat-

entable invention by a separate patent; and the fact that he may describe all of them in his application for an earlier patent to secure one of them does not invalidate a subsequent patent to him for those inventions therein described but not claimed. Nor does a patent void a later patent for an improvement thereon; or a patent for an improvement void a later patent for an invention on which the improvement is made. In other words, the ultimate question is always one of identity of invention.

While the application of Spinasse for the patent in suit was pending, and before its issue, he filed an application on a method for drawing glass cylinders, and obtained a patent, No. 1,085,068, which antedated the issue of the patent in suit. Defendant claims that the disclosure of the two patents is essentially the same in all respects, rendering void the patent in suit. This question was before the examiner of interferences in the interference issue, and was resolved in favor of the validity of the patent. It there appeared that the application in issue was recognized as a division of a prior application which disclosed a method of drawing glass cylinders, and also apparatus intended for use in practicing that method; while the claims of the divisional application involved in that issue are confined to the method alone. The application which resulted in the patent now set up as a bar contains but a single claim for a method of drawing glass. I think there is a substantial difference between the method there disclosed, and that in the claims in suit. In the former, the bait has what is termed "a novel supporting pocket," and the method consists in using the cold bait to form the novel in the pocket with room for movement at its inner end and receding from the orificial walls of the pocket, permitting the novel to externally set to this form before blowing. No such limitation is found in the claims of the patent in suit. In the latter, the glass flows "upwardly into the enlarged interior, the glass upon the interior of the bait supported free to shrink radially toward the center of the bait." A substantial difference thus appears in the methods disclosed. I think that the defense of invalidity on the ground of double patenting cannot be sustained.

[4] The claims of the patent being valid, we come to the question of infringement; and this involves the question of the scope or breadth of the invention. The patent does not cover, or pretend to cover, the drawing implement known as a cold bait. That was the result of a prior invention. The claims cover a method of using the cold bait to accomplish a certain result, that is, to prevent the crushing of the novel supporting the cylinder during the drawing operation. The claims are not basic in character, but narrow method claims, and therefore entitled only to the construction applicable to such claims. The authorities recognize a broad distinction between pioneer inventions permitting a wide range of equivalents, and those of a narrow character, which are limited to the construction shown. While it can never be contended that the result of a method is covered by the patent, we are apt to conclude that another combination to effect the same result is its equivalent and therefore infringes. In-

fringement is a tort, and the burden of establishing it, by evidence that is clear, satisfactory, and convincing, rests upon the plaintiff.

After a very careful consideration of the case, I am clearly of opinion that plaintiff has failed in such proof, and that, on the other hand, the defendant has established noninfringement by the strong preponderance of the evidence. My conclusion is based on the following considerations:

First. Spinasse's statement of invention recites that—

"My invention resides in the formation of a glass novel with a bait of a special structure and in such a manner that there will be an assured capability of relative movement of the glass novel upon the bait during the expansive and contractive actions which inevitably result during the drawing operation, and which necessarily are the source of the existing great percentage of breakage."

The special structure of the bait in which to form the novel and provide for its movement upon the bait clearly appears in the drawings and specifications; that is, a bait having its bottom open and its interior thereabove of larger dimensions, "having upwardly diverging working surfaces," and having "a lineal departure point at the orifice." By this is clearly meant a down-sloping ledge with "outwardly curved lips for the orifice of the bait pocket." Such is the construction of the bait.

Now as to the formation of the glass novel. We are instructed by the patent that while there is no definitely constant temperature at which the bait is operative, it must be low enough to prevent fusion, and "insure a lax clinging action of the novel upon the bait"; the inventor stating that he obtained the best results when the bait is below 200 degrees Fahrenheit. The inventor describes, as another main feature of the method, "the necessity for having a definite and ascertained initial formation of the novel upon the bait." His meaning here is made plain by the explanation that if the bait is dropped into the glass, it must be dipped no farther than will admit of a relative movement of the glass and bait; and that if the glass enters the bait through suction, care must be taken against forming the novel of such shape and expanse as will make the relative movement impossible. This is further explained on the second page at line 51, as showing why the bait must not be dipped too deep, because "this is only possible by so forming the novel as to length that it will not reach the widest point of the working surface before its upward movement under contraction"; and "there must be sufficient space left upon the working surface of the bait to afford room for the upward movement of the novel thereon."

A third feature claimed for the method "resides in the regulation of the density of the air at the juncture of the bait and the novel." It is stated that this is for the purpose of initially forming the glass article so that it will be assured of a capability of relative movement. It is explained that—

"This regulation of the density of the air may be by increasing or decreasing the volume of air at this point of juncture."

In other words, if the bait is dipped too deep, when the novel in its upward movement passes the widest portion of the bait, its movement will be obstructed by the inwardly inclining walls of the bait; while the outwardly curved lips of the orifice prevent the gripping of the neck of the novel by the mouth of the bait, thus again allowing freedom of movement.

It will thus be readily seen that in this method the structure of the bait as to downwardly sloping ledge, and outwardly curved lips at the orifice, and the formation of the novel, with a lax clinging action to the sloping walls of the bait, in conjunction with a loose neck, furnish "an assured capability of relative movement of the glass novel upon the bait during the expansive and contractive actions." And "a relative movement takes place between the glass and the bait, and the novel moves upwardly upon the working surface of the bait." That is, in the language of the claim, we find "the glass upon the interior of the bait supported free to shrink radially toward the center of the bait."

These are the vital steps in the method claim, with the result that rupturing pressures are avoided during the drawing operation. This is the clear teaching of the patent; a series of steps, definitely defined, to secure a definite result, that is, that the novel may not be crushed in the drawing operation, of which freedom of movement is the distinguishing characteristic.

Second. As bearing on the construction of the claims: Spinasse in his amended application had a number of claims broadly drawn to cover the forming of any novel in such a way that rupturing pressures are avoided during the drawing operation. The first claim was as follows:

"The process of drawing glass with a bait which comprises procuring thereon a novel supported without fusion, and insuring such relative form of the novel and bait that rupturing pressures are avoided during the drawing operation."

All these claims were later canceled, and the narrow claim suggested in the interference issue retained. After the conclusion of the interference, all the claims were canceled, except claim 13, being the claim in interference, and claim 1 of the patent in suit. The remaining claims of the patent were then added.

The patentee, or his assigns, is therefore precluded from urging a construction of his claims as broad as that of the claims rejected. On rejection of an application, it is well settled that every limitation and restriction inserted for the purpose of obtaining the patent is conclusive against a broader construction.

Third. In defendant's practice, a different method is employed with the same result, that the novel is not ruptured during the drawing operation.

In this method, there is no arrangement or provision for movement of the novel upon the bait. On the contrary, the effort is to prevent movement, keeping the novel and bait in contact without relative movement during the drawing, there being constant pressure of

the bait on the novel, but not sufficient to break it until after the cylinder has been capped off. This absence of movement is effected by the construction of the bait, and its temperature at the time the draw begins. The vitally essential element of Spinasse, the down-sloping ledge to allow for movement, has not been used by defendant since 1914. In defendant's practice, there is no "pocket with upwardly divergent working surfaces"; no "lineal departure point at the orifice." On the other hand, the defendant's plain bait has a slight upward slope of the ledge. They have also used pin baits successfully. In these, the glass runs in on the ledge around the pins, making movement between the bait and novel impossible. They have also used for about two years, with great success, the lock groove patented by Clark. This bait, so far from providing for movement, is constructed to prevent it. Instead of drawing the bait upwardly from four to six inches above the bath without air, and holding the bait there until the neck is set before distending air is used, as in plaintiff's practice, defendant leaves the bait only a fraction of an inch above the bath, and then turns on the air as soon as the glass has chilled sufficiently to anchor on the ledge. In this way, the neck, instead of being free from the edge of the bait, as with plaintiff is blown out against the mouth of the bait, and there being no outwardly curved lips for the orifice, no relative movement whatever is provided for. It will thus appear that so far as the structure of the bait is concerned, the shape of the ledge, the position of the novel on the ledge, and the pressure of the neck against the lips of the orifice of the bait, all tend to prevent movement as between the bait and the novel.

But again: Movement is prevented by raising the initial temperature of the bait far above that employed in plaintiff's practice. This appears to be between 500 and 600 degrees Fahrenheit. In using this practice, defendant employs the method of Wells, whose patent it owns. When the Wells patent was applied for, the board of examiners in chief, in allowing the claims, stated that they constituted a distinctly different process than that of Spinasse. They pointed out with great clearness that Wells aims to maintain a close fit between the bait and the novel, while that of Spinasse is to constantly maintain a loose fit. That the latter forms his novel so as to recede from the orificial walls of the pocket, allowing it to set before blowing, so that when the pocket contracts its walls will not come in contact with the novel; that this method requires a downwardly extending flange to permit motion; that Wells has an upwardly extending flange which precludes the use of Spinasse's method, as that would result in fracturing the novel; that "applicant must accordingly maintain a uniform expansion and contraction of the pocket and novel throughout his operation, and this is the result that his methods seek to accomplish." They then explain that the bait is initially heated to several hundred degrees, immersed in the glass, and kept there until heated to a temperature slightly below the fusing point, and then commencing the draw; that the bait thus has its highest temperature before the drawing begins, and during the draw

the contraction is substantially equal to that of the glass novel, and the two will therefore be maintained in substantial contact without a tendency to break the glass as it cools; that while the bait has a higher coefficient of expansion than the glass, it has a lower temperature and is subject to a lower rate of change of temperature during the cooling operation; and thus the two will contract at a substantially uniform rate, causing little change in the relative diameters of the bait and novel.

This scientific theory is sustained by the testimony of Profs. Bishop and Hower, scientists of high standing, who familiarized themselves with the practical glass drawing operation, studied the problem of contraction as between the bait and the glass novel in the cooling process, and who demonstrated by scientific tests that in fact no relative movement takes place between the bait and the novel in defendant's method and practice. The correctness of this theory is further shown when we remember that in the hot bait method, we are dealing with the same metals, with the same problem of varying temperature and resulting contraction of the iron and glass; and that if movement between these occurs, the glass would fracture at its junction with the bait and the cylinder fall with a crash. We know that to prevent this result the Thornburg cooling retarder was devised and used successfully to regulate the temperature conditions, and prevent any actual movement between the two metals.

From the foregoing, it will appear that the two methods are distinctly different, both attaining the same result. In the one case fracturing pressures on the novel are avoided, by providing for relative movement in the cooling process. In the other, the purpose is to prevent movement, keeping the bait and novel in constant contact, but preventing rupturing pressures by keeping substantially constant the relative diameters of the bait and novel by adjustment of temperature conditions.

This statement really covers the whole question of infringement. It is idle to argue that there must necessarily be movement between the novel and the bait because of contraction, even if practiced with the lock bait and the temperature conditions specified by Wells. Even if this were true, it would not avail the plaintiff. If movement between the two metals necessarily follows in any cold bait operation, and if thereby there is infringement of plaintiff's method, it is clear that plaintiff would have under his method patent an exclusive right to use the cold bait as against all others. Of course, this cannot be.

Without further elaboration, I am satisfied that the method employed in defendant's practice exonerates it from the charge of infringement, and therefore the bill must be dismissed at the costs of the plaintiff.

A decree may be drawn accordingly.