## WINDOW GLASS MACH. CO. et al. v. PITTSBURGH WINDOW GLASS CO. et al.

## PITTSBURGH PLATE GLASS CO. v. AMERICAN WINDOW GLASS CO.

(Circuit Court of Appeals, Third Circuit. September 30, 1921. Rehearing Denied January 20, 1922.)

Nos. 2663, 2684.

1. **Patents ⬤⟾328—834,165, for glass drawing and shaping machine, held void for inoperativeness.**

    The Raspillaire patent, No. 834,165, for a glass drawing and shaping machine, claim 15, for a bait or drawing implement, covers such implement only as an element of the machine described and claimed, of which the former is the essential feature, and the entire patent is void for inoperativeness of the machine.

2. **Patents ⬤⟾328—1,208,851, claims 1–4, for method of drawing glass cylinders, held not infringed.**

    The Spinasse patent, No. 1,208,851, claims 1–4, for method of drawing glass cylinders, *held* not infringed.

Appeals from the District Court of the United States for the Western District of Pennsylvania; W. H. Seward Thomson, Judge.

Suits in equity by the Window Glass Machine Company and another against the Pittsburgh Window Glass Company and others, and by the Pittsburgh Plate Glass Company against the American Window Glass Company. Decrees for defendants, and complainants appeal. Affirmed.

For opinions below, see 276 Fed. 193, 197.

No. 2663:

Geo. H. Parmelee, Geo. E. Stebbins, and Clarence P. Byrnes, all of Pittsburgh, Pa., for appellants.

Charles Neave and Clarence D. Kerr, both of New York City, for appellees.

No. 2684:

Marshall A. Christy, of Pittsburgh, Pa., and Frederick P. Fish, of Boston, Mass. (Charles Neave, of New York City, and James C. Bradley, of Pittsburgh, Pa., of counsel), for appellant.

Geo. E. Stebbins, Geo. H. Parmelee, and Clarence P. Byrnes, all of Pittsburgh, Pa., and Livingston Gifford, of New York City, for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. Because these two cases concern the art of mechanically blowing window glass, we discuss and dispose of them in one opinion. The art of blowing window glass by machine, as contrasted with lung blowing, was created and made commercially successful by the patents considered in this circuit in an opinion reported in Consolidated Window Glass Co. v. Window Glass Mach. Co. (C. C. A.) 261 Fed. 362. In that opinion this court described and dis-

⬤⟾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

cussed at length the window glass arts, and we avoid needless repetition by referring to that opinion, and by reference thereto thus making its description and explanation of the art as much a part hereof as though restated by quotation. This being done, and that opinion read, it suffices to say that both cases now before us concern the bait of a window glass blowing machine; that such bait is substantially the shape of an inverted mushroom, located at the lower end of a tube through which air is mechanically blown into the bottom or pocket of the bait; that the bait is first lowered and dipped into a molten mass of glass and then drawn upward carrying with it the molten glass, which is meanwhile being blown or distended into the cylinders, which were subsequently cut, flattened, and annealed, and thus made into the glass window panes of commerce. Originally the bait was of such high temperature that the molten glass adhered to it. Later it was found if a bait of much lower temperature, hence technically called a cold bait, could be used, that the molten glass, chilled by the bait's lower temperature, would not adhere to it. The cold bait has for various reasons proven more desirable than the hot and has virtually supplanted its use. Hence the great importance of these cases, wherein each of the great glass companies here litigating contends that it owns a patent which entitles it to an exclusive monopoly of the use of a cold bait, and that the other company—and therefore other users as well—infringe such patent. From these facts the importance and far-reaching effects of these cases will be seen.

These two companies having brought suit against each other upon their respective patents, the court below heard the two cases at the same time, and in opinions and decrees of the same date declined to sustain the contention of each company that its patent controlled the use of the cold bait, and dismissed their several bills, its opinions being reported in 276 Fed. 193, and 276 Fed. 197.

Thereupon each company took an appeal, which appeals were heard together in this court, and which, as we have said, it seems fitting we should now dispose of in a single connected opinion. Notwithstanding the voluminous records before it and the seemingly great number and complexity of the questions involved, the lower court found that in the final analysis the cases turned on comparatively simple questions. As we agree with the court's analysis of the real issues, the case before us therefore resolves itself into following or rejecting the lower court's determination of those issues. Ample time was given by this court to the arguments of these appeals. We have had the benefit of full and able discussions by counsel and the aid of elaborate briefs. To these aids we have since added a patient and detailed study of the cases with the result that we find no error in the action of the court below.

In view of the exhaustive and self-sustaining opinions of the trial judge and the fact that little or nothing additional remains to be said, this court might well limit itself to adopting such opinions as aptly setting forth its views. Instead, however, of so limiting ourselves, we shall, in view of the magnitude of the interests involved, the far-reaching effects of a decision other than we now make, not only on the two companies concerned, but to the consuming public whose use window

glass largely concerns, add a few thoughts which the argument and the later study of the case have borne in upon us.

The underlying and influencing fact in this case is that the pioneer stage of the making of window glass by machinery was reached and its complete commercial success assured earlier than these patents here in issue. And it is equally basic that the disclosures made by these patentees were attempts to improve an established, not to create an unknown art. In no way can the terms "radical," "revolutionary," "undreamed-of," elements that mark the pathway of inventive pioneership, be justly applied to their efforts to improve.

[1] Turning first to the patent of Raspillaire, No. 834,165, granted October 23, 1906, owned by the American Window Glass Company, we hold that Raspillaire recognized the existence of machines for drawing window glass, and his purpose was to improve them. In that regard he said he had "invented new and useful improvements in glass drawing and shaping machines." A study of his specification shows that his proposed improvement consisted of two interrelated changes in the existing practice and mechanism. As we have already stated, in that practice the blowing of air through the bait pipe into the bait pocket as the glass was being drawn upward served to initially form and thereafter maintain the cylinder walls as the cylinder rose in mid air from the pot of molten glass. In this air practice the glass necessarily took the form of a cylinder, and thickness uniformity or nonuniformity of the cylinder walls was effected by air control and manipulation. Now, as nonuniformity of cylinder walls might result in cylinder shattering during the drawing process or in inferior product, and as the cylinder had to be cut and subjected to the expensive and skilled flattening process, it seems that Raspillaire's idea was to avoid the use of air, avoid the inevitable production of cylinders, and do away with the labor and expense of flattening. That these two elements of air elimination and flattening elimination were the objects—and the only ones—Raspillaire had in view and disclosed is shown by his patent specification:

"When it is desired to draw glass for the purpose, for instance, of window glass—that is, in flat sheet form—my invention, as shown in Figs. 1 to 6, is particularly valuable in that the draw is made in the form of two walls or sheets of glass *without flaws and perfectly flat*. The consequence of the new combination of elements is the entire elimination of the heretofore *necessary process of flattening, as when glass is drawn in cylindrical form.* When glass is drawn in cylindrical form, it is necessary, as is well known in the art, to crack the cylinder and then subject it to a process of flattening, which requires expensive apparatus and the constant attendance of skilled operators. According to my invention, such expensive apparatus and operators are dispensed with."

The means by which Raspillaire proposed to dispense with air blowing and the irregularities and objections incident to the use of varying air was the use of a "former," which, as he conceived, "determines and imposes upon the draw the desired shape," and he therefore says:

"My invention relates to a machine for simultaneously drawing glass from a molten mass of glass and *imparting desired shape* to the draw.'"

He further emphasizes the prearranged contour of the glass by the shape of his "former," viz.:

"The former may be of any suitable configuration to impart to the draw a tubular formation of *any desired* shape. That illustrated in the drawings is one the use' of which will result in an oblong tubular draw, such as illustrated in Fig. 6 The former may be of other configuration; for instance, to draw a cylinder or hexagonal or octagonal tube."

It will thus be seen that the "former," the substitution of its predetermined shape and its unvarying contour after being shaped, was the gist and the only disclosure of Raspillaire, and the monopoly of invention to which he was entitled under the patent laws was adequately protected by claims and a construction thereof by the court which shall cover his "former" device and the incidents thereof.

Touching the latter element, namely, the mechanical incidents to his "former," we note what Raspillaire's specification says:

"Combined with the former is the drawing implement by which the glass is drawn over or about said former. This drawing implement is shown in separated detail in Figs. 5 and 6 of the drawings and consists of a body, 7, and a bait 8, detachably connected thereto. The drawing implement surrounds and is of cross-sectional dimensions and configuration corresponding to the *effective like dimensions and configuration of the former and has an operatively close fit to the former, whereby the glass in being drawn will contact with the active shaping-surfaces of the former to determine the cross-sectional size and shape of the draw*."

Moreover, it will be noted that not only was his "former" the gist of Raspillaire's device, but it was the only alleged invention he disclosed. If the mechanism by which his "former" was operated embodied any other inventive feature, Raspillaire either did not know of it, or, if he did, he failed to disclose it in his specification and thus comply with the statutory requirement on which to secure a claim for patent monopoly thereof. The alleged originality of his "former" Raspillaire emphasized in his specification by quotation marks, and in this form he made his "former" a claim element. The other six claims disclose nothing disassociated from his "former," but are manifestly but minor claims for parts or incidents of the "former" machine he had disclosed, and with this machine the six claims are associated by the claim element found in each, namely, "in a glass-drawing machine," and "on a machine for drawing glass," and it is in this true sense that this is a claim for a part of Raspillaire's "former" glass-drawing machine; that his claim here in issue, viz. "in a machine for drawing glass, a drawing implement adapted to be dipped into a glass bath and to draw glass therefrom, said implement provided with a groove to receive the molten glass," was allowed and must therefore be construed, and, this being done, the invention Raspillaire disclosed and his monopoly to the enjoyment thereof is fulfilled by limiting such claims to use in a window glass drawing machine which shapes by a "former," and not by air. Nor is there any ground for broadening such claim by construction to accord with the great and unlooked-for impress the invention made on the art, for Raspillaire's "former" made none. It was not commercially used, and the evidence in the record is to us, as it was to the court below, persuasive, and indeed convincing, that it

could not be used operatively. And in point of fact Raspillaire's patent and his "former" did not pass beyond the stage of a paper disclosure, and it yet remained such, until the success of the cold bait in the mechanical drawing of window glass evidently suggested the resurrection of this claim with its comprehensive literalism as a means of blanketing the use of cold baits, whose use Raspillaire had not disclosed, and, as we view it, had neither needed nor suggested in connection with his "former." In that regard the Commissioner of Patents, during the interference proceedings, held:

"No advance practically followed from Raspillaire's suggestion. For four or five years after his patents were granted the art was conducted exactly as it had been conducted since glass cylinders have been made by machinery."

Moreover, far from disclosing the use and operative functioning of his bait as a self-functioning cold bait by reason of its own relative temperature, Raspillaire made use of another element, namely, a presser to chill the glass his bait did not chill. In that regard his specification says:

"To enhance the security of the engagement of the bait with the glass, means are provided to compress the lip of glass which flows into the groove of the bait and chill the same. * * * When the drawing implement has been lowered into the molten bath and a lip of glass has flowed into the groove thereof, the pressure device is forced downward against the lip of glass by pulling upon the rope, compressing the glass into the groove, and *chilling and setting the same.*"

Finding, as we do, no error in the views of the court below in its estimate of this patent, it follows that its decree dismissing the bill of the American Window Glass Company and others against the Pittsburgh Window Glass Company and others should be affirmed.

[2] Having thus disposed of the attempt of the American Window Glass Company to blanket, by the patent of Raspillaire, the use of a cold bait in the mechanical blowing of glass, we now address ourselves to the effort of the Pittsburgh Plate Glass Company to do the same thing by the patent of Spinasse.

In taking up that question, we note the all-important basic facts that the claims of Spinasse's patent here in issue are not for a cold bait, nor does his specification assert the invention or show a disclosure by him of a cold bait. On the contrary, the study of the specification shows that his patent here involved, viz. No. 1,208,851, granted December 19, 1916, is for "a method of drawing glass," and not for an implement called a cold bait. Indeed, the specification assumes the existing use of a cold bait of some type in the art, and is for "a method of drawing glass * * * the essential feature of which is *the peculiar structure of bait.*" Now what the peculiar structure which constitutes "the essential feature" of his invention is Spinasse proceeds in his specification to point out, viz.:

"My invention resides in the formation of a glass novel with a bait of a *special structure* and in such a manner that there will be an assured capability of relative movement of the glass novel upon the bait during the expansive and contractive actions which inevitably result during the drawing operation and which necessarily are the source of the existing great percentage of breakage."

It will therefore be apparent that the existing evil which Spinasse sought to lessen was the breakage caused by the different relative contraction and expansion of the metallic bait and the glass novel.

In dealing with that problem Spinasse accepted as a fact that there operatively had to be in the use of cold baits a destructive differential of relative contraction and expansion of bait and novel, which would "inevitably result in the shattering of glass." This inevitable, accepted, operative, and destructive differential evil Spinasse proposed to counteract by "an assured capability of relative movement of the glass novel upon the bait," during the relative contractive and expansive actions of the glass and metal. In other words, Spinasse accepted the evil and provided a safety valve. The gist of his method was tersely and accurately summed up by the judge below in the statement that "fracturing pressures on the novel are avoided, by providing for relative movement in the cooling process." This relative movement of glass novel and metallic bait Spinasse counteracted by constructing his bait pocket with "upwardly diverging working surfaces and having what may be termed a lineal departure point at their orifice." This latter is effected "by the use of outwardly curved lips for the orifice of the bait pocket." Indeed, in summing up his disclosure in its entirety, Spinasse says his method consists of two steps: "First, the use of a cold bait, viz. curing a novel supported upon a bait without fusion"; the second, counteracting the destructive, but accepted, operative factor of the differential metal and glass contraction and expansion by "insuring such relative formation of the novel and bait that rupturing pressures are avoided throughout the drawing operation." It will thus—we emphasize by repetition—be seen that Spinasse's disclosed invention was based on two things: First, using a cold bait to form a novel, a practice which so far as this patent is concerned was old; and, second, by making his cold bait of such form as to allow the differential of novel bait contraction and expansion to vent itself by reason of the physical contour of his bait. This bait contour, we, for present purposes, assume was new. Such being Spinasse's method, we turn to a consideration of defendant's practice. It attacks the problem of breakage from a different angle, and the difference between the two methods may be illustrated by the difference between preventive and curative medicine. Spinasse cures an existing evil; the defendant prevents the arising of the evil. Spinasse overcame an existing evil by venting the evil on the upward curve of his bait; the defendant prevents the evil from arising, and therefore had no need to use Spinasse's venting device, or, indeed, anything of a venting kind. Its preventing differential contraction and expansion between glass novel and metal bait from operatively arising the defendant effects by novel bait thermal control or as aptly summarized by the court below when it said the defendant's "purpose is to prevent movement rupturing pressures by keeping substantially constant the relative diameters of the bait and novel by adjustment of temperature conditions."

Such being the radical difference between the two methods, the court below, in language we could not improve and for reasons to which we can add no weight by discussion, held that, while both practices les-

sened breakage, yet their methods of doing so were wholly different. In that respect it said, quoting the view of the patent office authorities which it adopted:

"They then explain that the bait is initially heated to several hundred degrees, immersed in the glass, and kept there until heated to a temperature slightly below the fusing point, and then commencing the draw. That the bait thus has its highest temperature before the drawing begins, and during the draw the contraction is substantially equal to that of the glass novel, and the two will therefore be maintained in substantial contact without a tendency to break the glass as it cools; that, while the bait has a higher coefficient of expansion than the glass, it has a lower temperature and is subject to a lower rate of change of temperature during the cooling operation, and thus the two will contract at a substantially uniform rate, causing little change in the relative diameters of the bait and novel."

From all these considerations it will be seen that Spinasse's method was a venting practice, venting a destructive force by the agency of bait contour. The defendant's method was a preventing practice by preventing the coming into operation of the destructive force. Such being the fact, we encourage inventive effort and beneficially administer the patent law by recognizing the patent differential in method between the two practices and in affirming as we do a decree which, in effect, adjudges that Spinasse and the defendant solved the problem of breakage by basically different methods.

The decrees below are affirmed.