RESEARCH PRODUCTS CO., Limited, et al. v. TRETOLITE CO. et al.

No. 9058.

Circuit Court of Appeals, Ninth Circuit.

Sept. 7, 1939.

Arthur C. Brown, of Kansas City, Mo., and Frank L. A. Graham, of Los Angeles, Cal., for appellants.

Leonard S. Lyon and Irwin L. Fuller, both of Los Angeles, Cal., Frank E. Bar-

rows, of New York City, and Paul Bakewell, of St. Louis, Mo., for appellees.

Before WILBUR, HANEY, and STEPHENS, Circuit Judges.

WILBUR, Circuit Judge.

This is an appeal from an interlocutory decree holding valid patent No. 1,467,831 issued September 11, 1923, to Wm. S. Barnickel, and holding that the patent had been infringed by the appellants. The patent covers a process for treating petroleum emulsions for the purpose of recovering the oil contained in the emulsion. The appellees also alleged infringement of two other patents (Nos. 1,223,659, issued April 24, 1917, to Wm. S. Barnickel, and 1,596,-589 issued August 17, 1926, to Dr. Groote), but the charge was withdrawn as to those two patents, and the sole issues on appeal are as to the validity and infringement of the first named patent (1,467,831). The problem claimed to have been solved by the process patented is that of freeing the oil imprisoned, within or outside, the small globules of oil and water making up the emulsion which comes from the oil well in that form. The emulsion is of no practical use as a fuel, and was a waste product until some means was developed for breaking the emulsion and thus setting free the oil imprisoned therein. Two other means had been employed for that purpose; the use of electric current, and of centrifugal force. The patentee conceived the idea of using chemicals to produce the desired result. The patentee believed that it was the surface tension of the water in the globules of the emulsion that overcame the action of gravity, which would otherwise cause the lighter oil to rise and the heavier water to settle to the bottom of the tank or other container. The patentee believed that this surface tension was in large measure due to the impurities in the water, and that if these were chemically changed, the tension would so far lessen that with the application of heat, if necessary, or without it, the oil would be released from the emulsion.

■ The first patent issued to Barnickel (No. 1,223,659) was for the use of water softeners in the process, particularly soap, and this patent process resulted in saving a great deal of oil that would otherwise have been lost. The patent in suit, called the modified fatty acid patent, is based upon the use of similar or analogous chemicals, broadly covered by the commercial name of Turkey red oil. The use of this type of chemical was highly successful and it is estimated that this acid process had resulted in the recovery of over a billion barrels of crude oil, at a relatively small cost.

So great and immediate a success speaks strongly of invention, adding emphasis to the strong presumption of invention, raised by the issuance of the patent. The appellants claim that the patent is void because of indefiniteness, lack of invention, double patenting, abandonment by publication; prior public use, and suppression of the invention before application for the patent.

### Indefiniteness.

■ The claim of indefiniteness is not free from difficulty, and will be considered first. The difficulty is inherent in the problem of expressing the discovery of the patentee in a form sufficiently definite to teach his process to those familiar with the art, and sufficiently broad to cover the invention. There are a number of variations in the problem due to the different chemical and physical characteristics of the impurities in the water, and of the oil contained in the emulsion, requiring different treatment for different emulsions. The problem is thus stated in the patent: "Owing to the fact that emulsions of the character to which my process is applicable differ greatly in their composition as to the character of the oil and water contained in the emulsions, the kinds and amount of the salts dissolved therein and the nature and amount of the colloidal matter present in the emulsion, I have found that in some instances one derivative of a fatty acid is more efficient than others in breaking a particular emulsion and in other instances an entirely different derivative or homologue will be found to be more efficient and economical." Thus far it is clear that the patent is indefinite leaving it as it does to experimentation to determine the particular chemical of a class to be used in each particular instance. It is claimed by appellants that the patent comes under the condemnation stated by this court, in Metals Recovery Co. v. Anaconda Copper Mining Co., 9 Cir., 31 F. 2d 100, 103, based upon the discussion of the Supreme Court in the Incandescent Lamp case, Consolidated Electric Light Co. v. McKeesport Light Co., 159 U.S. 465, 16 S.Ct. 75, 40 L.Ed. 221, and Corona Cord Tire Co. v. Dovan Chemical Corporation, 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610.

The patent claim in that case (Metals Recovery Co. v. Anaconda Copper Mining Co., supra) described the added agent as a "substantially non-oleaginous organic mineral collecting agent" that is "substantially non-frothing" and again as a "reduced and easily oxidizable organic mineral" [31 F.2d 101], which is substantially non-frothing. The patent there involved claimed to be an improvement upon a well known and generally used flotation process for collecting and recovering small metal particles from ore by the addition to the usual frothy mixture of a chemical agent which, it was claimed, added to the collecting capacity of the froth. The indefiniteness condemned in that case was in the description of this added agent. In the case at bar we have a very different situation. The field of operations involved was virtually unoccupied save by the earlier patent issued to Barnickel, (No. 1,223,659, supra), and the patentee has described the agent to be applied, not by vague description of its general physical characteristics, but by elaborate description of its chemical characteristics, which we quote from the patent as follows: "Any substance derived from fatty acids and which retains the fundamental characteristics of the fatty acids has the property of breaking such emulsions more or less effectively. I have also discovered that when a fatty acid is modified by the action upon it of certain substituting chemicals or reagents capable of forming addition or substitution products and the resultant product or its ester or salt, which, for convenience, I will refer to as a 'modified fatty acid,' is used to treat an emulsion of the character above referred to, the power of the treating agent to break the emulsion is greatly intensified."

Further, the patent states:

"One group of substances that I have found to be very efficient for treating such emulsions consists of practically all substitution and addition products of the fatty acids and mixtures of the same. Hence, for the sake of brevity, I have herein used the term 'modified fatty acid' to mean a substance, which, in addition to being obtained by the action of a reagent on a fatty acid, also retains the fundamental characteristics of the fatty acids and bears a simple genetic relationship to the fatty acids, the intention being to include by this term all substitution and addition products of the fatty acids and mixtures of same, which possess most of the qualities or distinguishing characteristics of fatty acids, but not to include soaps of the kind mentioned in my U.S.Patent, 1,223,659. * * *

"While any substance derived from fatty acids and which retains the fundamental characteristics of the fatty acids, has the property of breaking such emulsions more or less effectively, the following derivatives of fatty acids are particularly well adapted for breaking these emulsions, namely, the esters, and sulfonates of fatty acids, the sulfo-aromatic compounds of fatty acids, sulfurized fatty acids, the salts and esters of such substances, and mixtures of two or more of the substances above mentioned. The most practical and satisfactory treating agents that I have thus far found, however, are the esters and aromatic compounds of sulfo-fatty acids, the sulfo-fatty acids and the salts of such substances."

The claims herein involved describe the chemical agent of the patent as follows: In claims, 1, 2, 4, 7, 8 "modified fatty acid as herein defined"; in claims 9 and 10, "a sulfo-fatty acid."

The question is as to whether or not these descriptions of the chemical agent to be used in the process are sufficiently clear and definite to be understood and applied by those engaged in the art of organic chemistry as applied to petroleum recovery. Bickell v. Smith-Hamburg-Scott Welding Co., 2 Cir., 53 F.2d 356; Helfrich v. Solo, 7 Cir., 59 F.2d 525; United States Industrial Chemical Co. v. Theroz Co., 4 Cir., 25 F.2d 387; Minerals Separation Ltd. v. Hyde, 242 U.S. 261, 37 S.Ct. 82, 61 L.Ed. 286; Schumacher v. Buttonlath Mfg. Co., 9 Cir., 292 F. 522. This question is one of fact to be ascertained by the evidence of experts, Toledo Rex Spray Co. v. California Spray Co., 6 Cir., 268 F. 201, 204, and a finding of fact on the matter by the special master, concurred in by the trial judge on exceptions thereto, is entitled to great weight and is only to be disturbed if clearly wrong. Waxham v. Smith, 9 Cir., 70 F.2d 457, Anraku v. General Electric Co., 9 Cir., 80 F.2d 958, Stoody Co. v. Mills Alloys, 9 Cir., 67 F.2d 807, Antonsen v. Hedrick, 9 Cir., 89 F.2d 149. Both the special master and the trial judge held that the claims of the patent clearly covered sulfo-fatty acids; that such acids were well known in the art, and usually known commercially as Turkey red oil; that the patent was clearly valid as to such acids and that some of the appellants were using such Turkey red oil in the patented process and others were selling the product for that purpose. This

finding is sustained by the evidence. The appellees' experts testified that the patent description covers Turkey red oil and that this oil contains a sulfo-fatty acid.

We conclude that the finding of the court and special master as to the meaning of the patent is sustained by the testimony of credible experts appearing before the special master and that the finding should not be disturbed in so far as it is drawn in question here. If it is indefinite in some respects due to the comprehensive character of the invention and of the claims therefor, it is not uncertain in the area of description involved in this action. Any vagueness in these outlying boundaries of the description does not invalidate the patent as to that which is clearly defined. Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 22 S.Ct. 698, 46 L.Ed. 968; Faultless Rubber Co. v. Star Rubber Co., 6 Cir., 202 F. 927.

The appellants attempted to prove that some twenty-three chemicals produced in evidence coming within the description of the patent would not operate to break a petroleum emulsion. The test was made on only one emulsion from the California Production Company's Davis No. 2 well. This evidence was inconclusive. Furthermore, the trial court found that ten of the twenty-three alleged modified fatty acid products were of unknown composition, and that the other thirteen were outside the scope of the patent.

### Lack of Invention and Anticipation.

■ Invention is a question of fact and the special master and District Judge found as a fact that there was invention and no anticipation. The appellants rely for anticipation upon several patents (British patents Nos. 4481 and 11,877, both issued in 1906; U.S. patent No. 1,299,385 to Rogers and a Russian patent to Berkgan) all of which were considered and rejected by the trial court as not anticipating Barnickel's invention. The British patent No. 4481 to Lanza and Garnna of Italy, was for the process "for extracting olein and stearin from fatty acids", utilizing sulpho-oleic acid for the separation of oleic acid from the solid fatty acid, and has no application to the problem of separating two liquids bound together in one emulsion. The British patent No. 11,877 to Michele Lanza states that the invention has for its object a filtering apparatus for separating the substances constituting an emulsion when one of the substances consists of solid mat-

ter in a fine state of subdivision. Such a condition the evidence shows is not an emulsion but a suspension. The fact that sulfo-oleic acid (a sulfo-fatty acid) is used in the process is immaterial. The appellants insist that this patent anticipates that of Barnickel stating "One, reading that sulfo-oleic acid (a sulfo-fatty acid) would separate the constituents of an emulsion, would immediately turn to sulfo-oleic acid as a means of separating a crude oil emulsion." There is nothing in the patent or in the evidence to suggest that the disclosures of these British patents are applicable to the stable emulsions of petroleum and water. The Russian patent to Berkgan was granted April 30, 1914. This patent dealt with the problem of breaking the stable emulsions of petroleum and water by the application of naphthenic acids derived from mineral oil and sulphuric acid. It is claimed by appellants that these naphthenic acids contain sulfo-acid derivatives, and consequently anticipate the invention of Barnickel. The Rogers' patent No. 1,299,385, supra, cited by appellants, as anticipating Barnickel also used mineral oil for the production of the agent used in breaking the emulsion. Such oils are not fatty acids, and the agent derived therefrom for treating petroleum oil emulsions is not a sulfo-fatty acid nor a salt or ester thereof. We agree with the trial court that these patents do not anticipate the invention. The principle stated in Remington Rand Business Service, Inc. v. Acme Card System, 4 Cir., 71 F.2d 628, 634, 635, that for a prior patent to anticipate "it is sufficient that it suggests to one interested in the problem the means of solving it," is invoked by appellants, but has no application here.

### Abandonment.

■ The appellants claim abandonment of the invention by publication, by suppression, and by prior public use. The patent was applied for January 4, 1919. The findings of the lower court negative abandonment and as to abandonment by prior public use it is sufficient to say that the evidence sustains a finding that any use prior to 1918 was purely experimental. See Elizabeth v. Pavement Co., 97 U.S. 126, 134, 24 L.Ed. 1000; Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141. This conclusion also answers the claim of the suppression of the invention in order to prolong the period of monopoly. If the invention was not used

commercially and was only used experimentally as the trial court found the fact to be, there was no suppression of the invention within the meaning of the cases cited by the appellants, (such as Macbeth-Evans Glass Co. v. General Electric Co., 6 Cir., 246 F. 695; Kendall v. Winsor, 62 U. S. 322, 21 How. 322, 16 L.Ed. 165. Consolidated Fruit Jar Co. v. Wright, 94 U.S. 92, 24 L.Ed. 68) which hold that suppression constitutes an abandonment. The findings of fact concerning the alleged abandonment are supported by the evidence and should be sustained. As to evidence necessary to support a claim of abandonment see Cleveland Trust Co. v. Schriber-Schroth Co., 6 Cir., 92 F.2d 330, 335.

## Double Patenting.

The appellants claim that the water softening agent disclosed by the prior patent of Barnickel for the use of such agent (Patent No. 1,223,659) covered the chemical agents described in the "modified fatty acid" in suit (No. 1,467,831). The trial court found the fact to be otherwise and the evidence amply sustains the finding. The patent in suit expressly excludes from its terms, all water softening agents covered by the prior patent. The claim of double patenting amounts to a claim that the use of the agents described in the later patent would infringe the former. The District Court found that there was nothing in the prior patent which suggests the use of a sulfo-compound or of any addition or substitution product of a fatty acid. It is true that when Barnickel testified in an interference proceeding involving his claim to priority in the use of the chemicals covered by his modified acid patent subsequently issued, he claimed that the use of such products was already covered by his patent issued to him covering the use of water softening agents (No. 1,223,659). The Patent Office thought otherwise and after determining priority in interference proceedings issued the patent here involved. We conclude that the trial court was right in finding that there was no double patenting. The special master's finding was more elaborate, and explanatory. We quote this finding with approval: "The most pertinent reference to the modified fatty acid patent is the water softener patent. That patent discloses the use of a small group of treating agents which are soaps of the type of sodium oleate. The modified fatty acid patent discloses the use of a class of agents which are related to the soaps of the first patent only in that they both may be generally classified as belonging to that larger group of compounds derived from the fatty acids. The sulfo fatty acids of claims 9 and 10 are a sub group. The modified fatty acids of the other claims possibly include other groups but by disclaimer exclude the soaps of the water softener patent. It follows that there cannot be anticipation by the water softener patent or the use of Gold Dust which is one of the soaps of that patent."

We sustain the conclusion of the trial court that the patent is valid, and covers the use of sulfo-fatty acid and its derivatives.

## Infringement.

The appellants' product is called Hydrate No. 488 and it is used in the process for breaking emulsions of petroleum oil. The claim of non-infringement is based upon the fact that the product is made by subjecting castor oil to the action of fuming sulfuric acid. The appellants state their proposition thus: "As defendants have no fatty acid to modify, their product cannot be a modified fatty acid." The claim is that the product used by appellants is a sulfonated oil and not a sulfo fatty acid or a derivative thereof. The finding of the special master on the subject is as follows: "It follows that Hydrate 488 is a sulfo fatty acid which has been neutralized. Commercially it may be classified as a Turkey red oil. It is a 'modified fatty acid' in the sense that it contains substitution and addition products resulting from the action on ricinoleic acid of a reagent capable of forming such products."

Castor oil contains a fatty acid (ricinoleic acid) in combination. It is the reaction between this fatty acid and the sulfuric acid which produces the addition and substitution products used by the appellants covered by the patent claims.

Upon the claim of non-infringement the appellants contend that the claims of the patent are limited by occurrences in the patent office shown by the file wrapper. It is shown that claim 14 specifying the use of a sulfonated oil as a treating agent was withdrawn; hence that the "sulfonated oil" used by the appellants cannot infringe. Claim 14, the special master held, was broad enough to include treatment by modified mineral oils, not shown or included in the specifications and hence the claim was properly withdrawn. In any event its withdrawal did not affect the plain terms

of the claims allowed. Such withdrawal would only be important where the allowed claims were ambiguous.

It is also claimed that the appellants' chemical agent is "neutralized", hence not an acid and upon that ground they deny infringement. The patent claims cover the use of a salt or ester formed from a fatty acid. A salt is a neutralized product of an acid, and is covered by the express terms of the allowed claims. The patent examiner objected to the use of the term neutral products or neutralized products, as not shown by original disclosure of the patent. If the granted claims clearly cover the appellants' "product" it is not important that they may be properly classed as "neutral". The action of the patent office was solely in the interest of clarity. The disclosures of the patent clearly specify "salts" and "esters".

The infringement is clear.

### Contributory Infringement.

█ The Research Products Co. Ltd. and Abraham M. Herbsman are charged with contributory infringement in the manufacture and sale to the California Production Co., a corporation, and to Henry Branham and Arthur J. Dietrick of the chemical agent for use in the patent process of oil separation. Such sale for such use is not disputed.

### Claim of Unauthorized Monopoly of Unpatented Article.

█ The appellants cite Carbice Corp. v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819, and the later cases of Leitch Manufacturing Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371, and the American Lecithin cases, J. C. Ferguson Mfg. Co. v. American Lecithin Co., 1 Cir., 94 F.2d 729 in support of a claim that the appellees' method of transacting their business in the sale of the unpatented product, or agent, used in the patented process is condemned by these decisions and that the appellees, because of their attempt to create a monopoly in the use of such chemical agents for such purpose, cannot invoke the patent monopoly. This defense was pleaded but abandoned before the special master and was not raised in the exceptions to the special master's report, January 22, 1937. It was revived after the decision of the District Court, March 2, 1938, by a motion to reopen the case, May 23, 1938, in the light of the recent (January 3, 1938) decision of the Supreme Court in Leitch Mfg. Co. v. Barber Co., supra. On July 9, 1938, the District Court denied the motion on the ground that the record presented no facts governed by the above cited decisions. There was no error in the ruling. To have granted it would have involved a retrial of the case on an issue not presented theretofore. We agree that the record does not show the essential facts necessary to the application of the rule preventing recovery for infringement because of an illegal use of the patent monopoly to create another distinct monopoly in an unpatented material.

### Expert to Assist the Court.

At the suggestion of the District Court the parties agreed to the appointment of an expert chemist to assist the court in understanding the technical problems involved in the consideration of the exceptions to the special master's report. Both parties contend here that such appointment was proper. Dr. Beckman, a member of the faculty of the California Institute of Technology, was appointed by the trial judge and sat with the trial judge during the argument on these exceptions. The record contains nothing concerning the information or advice given to the judge by Dr. Beckman. Conceding the propriety and even the desirability of such an appointment, and of such information or advice particularly where the parties consent thereto, it is obvious that where expert chemists have testified as to divergent or contradictory views concerning the scientific problems involved in the case, that the appellate court is not in a position to intelligently review the case because of the absence of such information or advice. The question of the alleged indefiniteness of description of the chemical agents used in the patented process, the question of double patenting involving as it does the chemical identity of the agents employed under the "water softening" patent and the chemicals employed under the "modified fatty acid" patent, and the question of the chemical identity of the agent used by the appellants with those described in the modified fatty acid patent are all questions based upon chemical science and its nomenclature. A judge who professes his ignorance of this subject and requests the aid of a chemist to be appointed by him in solving the problems presented by the diverse testimony of the experts is almost certain to follow the

advice of the neutral expert. How can he do otherwise? If the advice was in the form of sworn testimony given in open court and subject to cross-examination by the parties the method would be more desirable. We do not wish to condemn or criticise the method adopted by the parties and the trial court. It should be pointed out, however, that the parties who have so agreed, to say the least, have an unusually heavy burden in attacking the findings of fact made by the trial court in such a case. The fact is that we do not have before us the same evidence upon which the trial court acted. As we affirm the findings of the trial court under the rules usually applicable to appeals in equity cases it is unnecessary to pursue this subject further.

Interlocutory decree affirmed.