## WISCONSIN ALUMNI RESEARCH FOUNDATION v. VITAMIN TECHNOLOGISTS, Inc., et al.

### No. 565-M Civil.

District Court, S. D. California, Central Division.

Oct. 1, 1941.

860

See, also, D.C.Cal., 1 F.R.D. 8.

George I. Haight, Frank Parker Davis, and Ward Ross, all of Chicago, Ill., and Lewis W. Andrews, of Los Angeles, Cal., for plaintiff.

R. Welton Whann and Robert M. Mc-Manigal, both of Los Angeles, Cal., for defendants.

CAVANAH, District Judge.

The suit involves the validity and infringement of three patents issued to Dr. Harry Steenbock of the University of Wisconsin, who transferred his interest in them to the plaintiff, Wisconsin Alumni Research Foundation of Madison, Wisconsin, a non-profit affair, which was organized in 1925 for the purpose of promoting scientific research at the University in assisting in the development of inventions and discoveries made by the faculty and students of the University. The defendant Vitamin Technologists is a corporation organized under the laws of the State of California, and the defendant H. F. B. Roessler is a director and officer of the defendant corporation.

The first patent, No. 1,680,818, entitled "Antirachitic Product & Process," was issued August 14, 1928, on an application of Harry Steenbock on June 30, 1924. The second patent, No. 1,871,136, entitled "Antirachitic Product Essence and Process", was issued August 9, 1932, upon an application of Harry Steenbock, filed December 27, 1926, and is stated therein to be a continuation in part of the first patent, and the third patent, No. 2,057,399, entitled "Antirachitic Product and Process," was issued October 13, 1936, on application of Harry Steenbock filed May 14, 1932.

The first patent contained claims directed to the process of imparting antirachitic properties to organic substances of dietary value which comprises subjecting the same to the action of ultra violet rays such as are produced by a quartz mercury vapor lamp for a period sufficient to effect antirachitic activation but seems to be so limited as to avoid subsequent substantial injury to the antirachitic principle.

The second patent contains claims directed to the process of producing a concentrated antirachitically activated substance from substances rich in unsaponifiable lipoids which comprises separation and irradiation of unsaponifiable lipoids, such irradiation being effected by subjecting the lipoids before or after separation to the action of the ultra violet rays such as emanate from a quartz mercury vapor lamp for a period sufficient to effect antirachitic activation and claimed to be limited so as to avoid subsequent substantial injury to the antirachitic principle. It also contains claims directed to an activated edible compound comprising an unsaponifiable lipoidal extract activated antirachitically in accordance with the process stated in claim 1, compounded with an unactivated edible substance.

The third patent contains claims directed to a process which comprises antirachitically activating yeast by subjecting it to the action of artificially produced ultra violet rays for a period sufficient to render the yeast antirachitically active.

With respect to the infringement, the plaintiff contends that the defendants within the last six years and subsequent to the granting of the patents have wilfully infringed them by practicing the processes covered by them and asserts that the defendants have infringed claims 1, 2, 3, 5, 6 and 8 of the first patent; claims 1, 2, 3, 5, 6 and 7 of the second patent, and claims 3 and 4 of the third patent, and that the date of the invention of the second patent goes back as early as the date of the application of the first patent, and the date of the third patent to the date of the second patent, and that all of the inventions of the three patents in suit were made by Dr. Steenbock before the time of the filing of the application of the first patent on June 30, 1924.

The defendants challenge the validity of the patents and assert that (a) they are anticipated by prior publications and patents, and lack invention over the prior art and are not new and useful art and therefore not patentable subject matter. (b) That they are improperly drawn and defined and the Commissioner of the Patent Office exceeded his authority in issuing them. (c) That there is insufficiency of disclosure and indefiniteness of claims. (d) That the claims thereof cover broad classes some materials of which are not activatable with ultra violet rays, and with those materials the inventions are not workable. (e) That they cover a process, principle or law of nature which is not patentable. (f) That the plaintiff is guilty of laches in not instituting the suit within a reasonable time after it knew of the infringing activities of the defendants, and is therefore estopped from asserting its rights against the defendants. (g) That the defendant H. F. B. Roessler has never manufactured or used or sold any machine, product or process of any of the patents in suit and is therefore not personally liable.

At the trial considerable evidence was introduced as to what the three patents in suit cover, and upon the issues thus stated.

## What the First Patent Covers.

It appears to relate "to a method of preparing antirachitic products of edible character, such as foods and medicines, and to the products obtained by such method of treatment," and "the process is effected by subjecting edible substances to the action of rays of the region of the ultra violet rays of the spectrum in such manner as to effect the antirachitic activation," and "which comprises subjecting the same to the action of ultra violet rays such as are produced by a quartz mercury vapor lamp, for a period sufficient to effect antirachitic activation but so limited as to avoid subsequent substantial injury of the antirachitic principle." The patents relate to a substance that is able to prevent the development of rickets, vitamin D, which is scarce in the diet of the ordinary person and needed in the diet, and contributes to building strong teeth and bones, and is applied in the prevention and cure of the disease known as rickets, prevalent during infancy, causing faulty bone structure. It covers a process employing an artificial activating agency in such a manner as to accomplish what the natural agency does not and cannot do. It covers the need for the use of artificial sources of ultra violet light and contrives a new method for its direction towards ends. It provides the procedure to be followed in respect to the use of ultra violet light which it asserts there is a difference in effect occasioned by the length of time of the exposure of the material to it, the volume of the product being treated, and the directions there given are that in activating the materials the effect would be to produce vitamin D in them, which depends exclusively upon supplemental sources for vitamin D, and prevents vitamin D deficiency then existing. The patents are not upon the lamp, but new processes in which ultra violet light is utilized and invented products derived from the utilization of ultra violet light, and in the process the organic substances of dietary value are subjected to the action of ultra violet rays. A new mode for employing ultra violet light and has produced new results in providing in medicines and foods, vitamin D for the prevention and cure of rickets in mankind and animals, and the evidence discloses that the nature of the invention is useful in a number of branches of the drug industry and food products.

## What the Second Patent Covers.

It is called the essence patent and the application for it was copending with

the application for the first patent of June 30, 1924, and recites, to be a continuation in part of the application of the first patent "in so far as subject matter is common to both". Novadel Process Corporation v. J. P. Meyer & Co., Inc., et al., 2 Cir., 35 F. 2d 697. It deals with the production of an antirachitically activated essence. It involves the extraction of a compacted provitamin substance called unsaponifiable lipoidal extract from organic substances, and the irradiation with ultra violet rays of such extract to produce a convincing antirachitic preparation. The treatment of the compacted unsaponifiable lipoids by ultra violet rays is in accordance with the process therein described and results in antirachitically activating the lipoids so that the activated compact extract will serve as a superior curative agent adapted to prevent and cure rickets. It provides that the activated essence of lipoids may be used in medical quantities or may be introduced in limited quantities in foods of various kinds, thus imparting antirachitic properties. It calls for separation of the unsaponifiable lipoids from the substance either before or after irradiation. Its relationship appears to certain claims in the first patent which related to the antirachitic activation of unsaponifiable lipoids after their separation from a substance containing lipoids. The original application contained subject matter as ample basis for the claims in this patent and the subject matter contained in the specifications of this patent relates to elaboration and detail upon the original subject and is therefore a different and separate inventive idea from the first patent. The evidence shows that each species of substance activated by Dr. Steenbock constituted a separate discovery which disclosed that certain procedure patent substances do contain a fraction which can be separated as an essence and by irradiation with ultra violet rays be changed into an activated essence of great power, and patents for different species claimed may be good inventions and are considered as patents for different inventions. Pittsburgh Plate Glass Co. v. American Window Glass Co., D.C., 276 F. 197; Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co., 2 Cir., 22 F.2d 259, 261. This principle is recognized by the Ninth Circuit Court of Appeals in the case of Cookingham v. Warren Bros. Co., 3 F.2d 899, 903, where it is said: "Inventions that stand in relation by way of species and genus do not prevent an inventor from obtaining patent for each, and when the inventions are different it is not material that the issuance of the one patent was prior to the issuance of the other." The inventor may be entitled to a patent for the process for producing a new and useful result on his own invention. Dayton Fan & Motor Co. v. Westinghouse Electric & Mfg. Co., 6 Cir., 118 F. 562; Badische Anilin & Soda Fabrik v. A. Klipstein & Co. et al., C.C., 125 F. 543.

It can be seen from a study of the patents and the evidence that the second patent is an improvement of the first patent as the process covered by it pertains to and has a general application to the claims covered in the first patent. At the time of the issuance of the first patent Dr. Steenbock had not discovered that unsaponifiable lipoids were highly activatable by ultra violet rays, but thereafter he did. Such being the case, a stranger, or he, would be entitled to a patent on their subsequent invention, as the invention of the first patent can be practiced without infringing the second patent, and there would be no double patenting.

### What the Third Patent Covers

It is called the yeast patent issued October 13, 1936, on an application of date May 14, 1932, and states that it is a continuation in part of the application filed December 27, 1926, now patent No. 1,871,-136, and the discovery upon which it "is based, is that yeast, which is a fungus, is capable of being antirachitically activated by means of ultra violet rays," and claims; "The process of producing an antirachitically activated product which comprises: subjecting yeast to the action of light comprising ultra violet rays for a period sufficient to effect substantial antirachitic activation of the yeast." It relates to the activation of the yeast and how it may be accomplished, the length of time of exposure to the rays, the intensity of the light, the distance of the material from the light and the product obtained. It seems that before the filing of the first application of June 30, 1924, Dr. Steenbock had irradiated yeast with ultra violet rays and produced an antirachitically activated yeast. He says that through inadvertence yeast was not specifically mentioned in the application of June 30, 1924. Subsequently he filed an amendment on August 12, 1925, including yeast and the specification included disclo-

sure of the activation of yeast in stating that "yeast may be irradiated and antirachitically activated," which was approved by the Board of Appeals. It is therefore legal and fair to conclude under the evidence that the claims in the third patent are based upon the subject matter disclosed in the continuation—in part—of the application for the second patent filed on December 27, 1926, and is entitled to the date of December 27, 1926. It appears to be for a different invention than the first patent and cannot be considered as double patenting as between it and the first patent. It, like the first and second patents, presents sufficient information to those skilled in the art to which it appertains to enable them to practice the process. There is no prior art disclosing the antirachitic invention.

### Validity of Patents in Suit.

The defendants argue that by the prior art all of the elements which Dr. Steenbock uses are old and are anticipated by prior publications and patents and lack invention over the prior art as Dr. Steenbock uses the same light, time, distance and materials and produces vitamin D which has been produced for years and therefore is not patentable subject matter. The fundamental thought under the issues and evidence requires the consideration: Was it Dr. Steenbock who first found the particular remedy for rickets given by the activation of medicines and foods through the use of ultra violet light, as described in the patents and claims in suit? And if so, he would be entitled to protection as an inventor although other scientists were working in the field and seeking, failed to make the inventions prior to him covering the claims in suit for processes of antirachitically activating or producing an antirachitically activated product embodied in Dr. Steenbock's discovery that existing organic substances of dietary value could have imparted to them antirachitic properties by subjecting them to the action of ultra violet rays such as are produced by a quartz mercury vapor lamp. He was the first to discover that ultra violet rays when used under the conditions here referred to would render antirachitically active, organic substances to which rays are applied. A study of the prior publications and patents relied upon by the defendants show that the authors were not dealing with vitamin D, and they do not contain any teachings of the use of ultra violet light in the anti-

rachitic activation of medicine and food and do not teach the cure and prevention of rickets. They did not make any contribution regarding the antirachitic activation of medicine and food, nor present teachings of the Steenbock inventions for the treatment of rickets in animals and infants, as there was no knowledge extant prior to Steenbock's discovery that organic substances deficient in vitamin D could be activated antirachitically by energy treatment or light. His discoveries opened a new field, capable of being used advantageously, of new sources of vitamin D in the diet. The specifications relied upon as an anticipation must give in substance the same directions and knowledge as the specifications of the patents in suit. This is not done. Skelly Oil Co. v. Universal Oil Products Co., 3 Cir., 31 F.2d 427. So under an analysis of a preponderance of the evidence, the conclusion is inevitable that the patents in suit are not anticipated by prior publications and patents, and are new, useful art, and cover materials which are activatable with ultra violet rays, and are workable patentable subject matter. Their claims are definite and the disclosures appear sufficient as they teach the use of ultra violet light in the activating of the materials so as to produce vitamin D, and seem clear and concise to be understood by those of knowledge of prior inventions in the same science. Anraku v. General Electric Co. (Pacific Importing Co. et al. v. General Electric Co.), 9 Cir., 80 F.2d 958.

In an interesting case disposed of by Judge McCormick, of American Bitumuls Co. v. Union Oil Co. of California, D. C., 24 F.Supp. 795, 802, and which was affirmed by the Court of Appeals, 9 Cir., 109 F.2d 140, the conclusion was reached that: "The certainty required is that which is reasonably clear to those skilled in the art. Minerals Separation v. Hyde, 242 U.S. 261, 37 S.Ct. 82, 61 L.Ed. 286."

The rule recognized by the 9th Circuit Court of Appeals as to certainty required is: "If it is indefinite in some respects due to the comprehensive character of the invention and of the claims therefor, it is not uncertain in the area of description involved in this action. Any vagueness in these outlying boundaries of the description does not invalidate the patent as to that which is clearly defined. Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 22 S.Ct. 698, 46 L.Ed. 968; Faultless Rubber Co. v. Star Rubber Co., 6 Cir., 202

F. 927." Research Products Co., Limited, et al. v. Tretolite Co. et al., 9 Cir., 106 F. 2d 530, 534;· Carson v. American Smelting & Refining Co., 9 Cir., 4 F.2d 463; Skelly Oil Co. v. Universal Oil Products Co., supra.

■ It is a general rule that the last step taken under a claimed discovery which turns failure into success is an invention and is 'that which is sustained. Barbed Wire Patent, 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154; Carnegie Steel Company v. Cambria Iron Company, supra; George Frost Co. et al. v. Cohn et al., C.C., 112 F. 1009.

■ The objection that the claims in the patents in suit cover broad classes of materials of which some are not activatable with ultra violet rays and with those materials the inventions are not workable is without merit, as it is sufficient to say, as heretofore stated, that the claims are for processes of antirachitically activating or producing an antirachitically activated product, and do not cover materials which cannot be activated, and in this respect it will be repeated that the invention was that of a process of operating upon known compositions of matter thereby to bestow to them the property giving to them value tending to ward off disease, and in the science of healing, not normally possessed by them. The discovery is not confined to responsiveness of any one particular member of the class of organic substances of dietary value, for the process seems applicable generally. This Dr. Steenbock ascertained before he applied for the first patent in which a number of the members of the class which can be antirachitically activated by the practice of the process are named. It was not essential that there should be named all organic substances of dietary value. Union Oil Co. of California v. American Bitumuls Co., supra; Anraku v. General Electric Co., supra.

### Law or Process of Nature

■ The argument is pressed that the inventions of the patents in suit cover only a law or process of nature and the foundation of the argument is that they cover the use of sunlight and nature's practices as sunlight, as "Mother nature forms vitamin D in foods eaten by man and animal and forms vitamin D in man and animal whenever exposed to the sun", and is not patentable, presents the interesting question as to whether or not the process covered by the patents may utilize a law of nature by means of an art and put it in a certain specified condition and then use it in that condition for a practical purpose. The process claims in the patents utilize ultra violet light. It did not discover or invent ultra violet light, but invented processes in which ultra violet light is utilized and invented products derived from the utilization of ultra violet light. The patents are not directed to what nature was doing, as it was not known prior to then that the sunlight, unaided by man, was efficient to treat edible products or inactive substances so as to activate the provitamin in such substances or products and thereby make them a preventative or cure of rickets. It does not appear by the evidence that there are instances in which activation of vitamin D in medicine or food has occurred through nature's use of ultra violet rays unaided by man. The patents here are not upon the lamp, but as stated in the first patent: "According to the present invention, feeds for animals, and food products for man, and medicines for man and animals, may have imparted to them the antirachitic factor, or may be rendered antirachitically active by subjecting them to action of actinic rays, and especially the rays in the region of the ultra violet rays of the spectrum, such as emanate from a mercury vapor lamp. The activation is very readily effected by means of a quartz mercury vapor light, though the open flame carbon are, or other source of light may be employed in effecting the activation." "Sunlight, of course, contains ultra violet rays, but it is not available practically for the production of the antirachitic principle. Artificial light, right in the rays of the ultra violet region of the spectrum, is necessary."

These terms of the patent and the evidence disclose that Dr. Steenbock whose discoveries concerned with the effects of sunlight followed them up by inventing a new method by which to accomplish through artificial means what sunlight could not do. It appears clear that prior to the Steenbock discoveries and invention it was not known that it was possible to treat edible products with ultra violet rays so as to make such product a preventive or cure of rickets, and such process was practical through the use of sunlight, or that the ultra violet rays of the sun could not antirachitically process medicine or food with any distinction as to selection of substances, or of intensity, or of time, or that

ultra violet rays of the sun could not practically impart the antirachitic principle to medicine or foods as the only then recognized edible, antirachitic substance was cod liver oil. It seems clear as the evidence demonstrates that the rays of the sun are not of the intensity of rays such as are produced by a mercury vapor lamp and that it was man who made use of artificially produced ultra violet rays which supplied the practical mechanical contrivance that sunlight had not given, and no product is shown to have been activated by the sun left to itself. Under most circumstances the scientists seem to realize that the amount of sunshine is inadequate for the prevention or treatment of rickets and it becomes necessary to *supplement* the diet of the infant with some special sources of vitamin D, so that such supplements of one kind or another must be given in order to be assured of protection against the disease of rickets.

The principle of law is settled that if one has gone beyond the *domains* of discovery and laid hold of a new force and connected it with some *mechanical contrivance* through which it acts, he is entitled to secure control of it, for the existence in nature of a force that can be and is used by man does not argue against invention unless the invention consists simply in adopting what nature, unaided, gave. It is the use that is patentable, the utilizing of a law of nature by means of a method. The process covered by the patent is patentable if it is one where, as said by Judge Lacombe of the Second Circuit Court of Appeals: "The process is one which puts a force of nature into a certain specified condition and then uses it in that condition for a practical purpose." Cameron Septic Tank Co. v. Village of Saratoga Springs et al., 2 Cir., 159 F. 453, 463; Telephone Cases, 126 U.S. 1, 8 S.Ct. 778, 31 L.Ed. 863; American Chemical Paint Co. v. C. R. Wilson Body Co., D.C., 298 F. 310.

In respect to the yeast and essence patent, nature never provided any unsaponifiable lipoid extract, activated, or prepared a concentrate to be activated to be used as a cure or preventative for rickets, or that yeast was ever antirachitically activated by subjecting it to the action of the ultra violet rays of the sun. It was not known prior to the Steenbock inventions that edible products or inactive substances could be treated with ultra violet rays so as to make them a preventative or cure of rickets. Prior to the plaintiff's patents, rickets were increasing among infants and neither the sun nor man had an antirachitic food or medicine activated by ultra violet light or an essence antirachitically activated for prevention and cure of rickets. The claims of it do not cover sunlight and is limited to the employment of "artificially produced ultra violet rays" and are supported by the specification of the second patent and are not based upon any new matter.

Stress is made that the principle recognized by the Ninth Circuit Court of Appeals in the case of Wall v. Leck, 9 Cir., 66 F. 552, 558, should be applied to the patents and evidence here, but when one reads the facts in that case it will appear that the Court was considering the use of an old process known and used by man prior to the claimed invention of the patentee which was the same process, and the patentee took it and proposed to practice during the night instead of during the day time, as to which the Court said that they had not invented a new process, and remarked that: *"not until some new instrument or method is contrived for its direction towards ends which it cannot naturally accomplish does his creative genius manifest itself"*. Here we find that was done in utilizing artificial means for producing ultra violet rays and contriving a method whereby the ultra violet light was given "direction towards ends which it cannot naturally accomplish." There is no analogy between the two situations.

The further contention that the claims do not contain patentable subject matter, as they are for an effort and not a process, is not sustained by the claims and the evidence, as the inventions here "[consist] in the subjection of a specific object to the influence of a specific force through a specific mode of application. That is a true process or art, as distinguished from a principle or effect, and as such is within the scope of the patent act, and consequently is patentable subject-matter." American Chemical Paint Company v. Wilson Body Co., supra. [298 F. 311]. See Cochrane v. Deener, 94 U.S. 780, 24 L.Ed. 139.

Attention is called to the case of Wall v. Leck, supra, where the Court recognized the principle that a natural force is not the product of inventive skill, but points out the distinction in method for its direction

as the patent there did not follow up the discovery by inventing some new process or method that contrived for its direction, but recognized the principle urged by plaintiff that "not until some new instrument or method is contrived for its direction towards ends which it cannot naturally accomplish does his creative genius manifest itself." While the Court there reached the conclusion that the invention covered a process of nature, the facts are distinguishable from the present inventions as the present discoveries which concerned with effects of sunlight were followed up by the use of artificial means for producing ultra violet rays which sunlight did not and could not perform.

## Laches and Estoppel

The defense of laches which is an equitable principle depends upon the particular facts in each case and should be applied in a patent case under the universal rule that: "Where a patentee, by deceitful acts, silence, or acquiescence, lulls an infringer into security, and induces him to incur expenses or suffer losses which he would not otherwise have sustained, courts of equity apply the doctrine of laches on the principle that one ought not to be permitted to deny the existence of facts which he has intentionally or recklessly induced another to believe to his prejudice." Stearns-Roger Mfg. Co. v. Brown, 8 Cir., 114 F. 939, 944.

The Ninth Circuit Court of Appeals when considering the doctrine of laches in a patent infringement case has recognized the modern rule in saying that: "There was thus a period of over five years before suit was brought during which appellees knew that the appellant was infringing their patent. But in deciding whether or not a plaintiff is barred by laches from prosecuting his suit, courts of equity generally follow the analogous statute of limitations. When suit is brought within that time the burden is on the defendant to show that extraordinary circumstances justify the application of the doctrine of laches. City of Roswell v. Mountain States Telephone & Tel. Co., 10 Cir., 78 F.2d 379, 385. See Gillons v. Shell Oil Co., 9 Cir., 86 F.2d 600. There must be reliance on the delay resulting in a change of position by the party asserting laches. The question of whether the doctrine of laches should be applied rests in the sound discretion of the trial court. Appellant, in its brief, points to no evidence in the record showing a change of position after notice of infringement by appellees that would justify this court in reversing the decree of the District Court and applying the doctrine of laches either as to the accounting or the injunctive relief." Craftint Mfg. Co. v. Baker et al., 9 Cir., 94 F.2d 369, 374. Also, see Columbia Graphophone Co. v. Searchlight Horn Co., 9 Cir., 236 F. 135.

It will be observed that the Court in the case of Craftint Mfg. Co. v. Baker, supra, recognized the universal rule: "Courts of equity generally follow the analogous statute of limitations." And: "When suit is brought within that time the burden is on the defendant to show that extraordinary circumstances justify the application of the doctrine of laches."

The period within which suit is to be brought for the recovery of damages or profits for infringement is six years, Title 35, U.S.C.A. § 70. France Mfg. Co. v. Jefferson Electric Co., 6 Cir., 106 F.2d 605; Drum v. Turner, 8 Cir., 219 F. 188; Ide et al. v. Trorlicht, Duncker & Renard Carpet Co. et al., 8 Cir., 115 F. 137.

Thus the present rule seems clear that the facts and circumstances must disclose that the patentee must, by such acts as are deceitful and acquiesced in by him, lull the infringer into security, and the reliance on the delay by the infringer resulted in the change of his position which induced him to suffer loss and incur expenses which he would not have otherwise done.

What then are the relative facts bearing upon that defense? It appears that in 1933 the defendant Roessler and others secured a patent known as the Campsie patent and now owned by the defendant corporation, and they formed the Chesney Foundation, which activities were in March, 1934, called to the attention of the plaintiff, who through its agent orally notified the Foundation that if it should manufacture vitamin D by the use of ultra violet rays it would be considered as infringing plaintiff's patent and action would be taken. At that time the Chesney Foundation was not carrying on any substantial volume of infringing business. Thereafter in June, 1934, plaintiff was informed of the operation of Davis Perfection Bakeries, Inc., one of the customers of the Chesney Foundation, and notified it of the infringement. Subsequently through correspondence the plaintiff learned of the

change of name to Vitamin Technologists, Inc. It seems to have been the policy of the plaintiff to watch the operations of those who were infringing its patents. In the year 1936 the business of the defendant was approximately $30,000 and in October of that year plaintiff served a formal written notice of infringement on the defendant corporation. The notice was not withdrawn and nothing was further done by plaintiff until the present suit was instituted on September 15, 1939.

The attitude of the plaintiff as to infringement was to interview its licensees as it was obligated by agreement to share in the expenses of litigation with respect to infringing its patents. As late as March, 1939, the defendant corporation's business seems to have been in the experimental stage and its infringing activities were of such a scope and unimportance as to not justify the expenditure of patent litigation. The evidence does not disclose that the position of defendants was changed by reliance upon any acts of the plaintiff, or that they ever lost any evidence, or had been misled, or any substantial investment in equipment or plant during the years of 1934 to 1939.

At the time of the pending of the litigation involving the validity of two of the plaintiff's patents, and at the time of the commencement of the present action there was pending under the Declaratory Judgment Act, 28 U.S.C.A. § 400, between plaintiff and New Discoveries Incorporated in the Western District of Wisconsin, an action known to the defendants. Such pending litigation was sufficient reason for not instituting the present suit for infringement until the patents were finally adjudicated. Timolat v. Franklin Boiler Works Co., 2 Cir., 122 F. 69; Schey v. Turi, 2 Cir., 294 F. 679; United States Mitis Co. v. Detroit Steel & Spring Co., 6 Cir., 122 F. 863.

■ It would not seem that under the evidence, the defense of laches or estoppel is sustained, as the defendants have not changed their position because of any action of the plaintiff, and had received the oral notice in 1934 and written notice in October, 1936, from the plaintiff stating its position. The plaintiff was not required to act differently than it did, and therefore the delay in bringing the present action, under the record, was not unreasonable.

## Unclean Hands

■ The charge is made in the defendants' answer that the plaintiff is not entitled to recover because it comes into Court with unclean hands and is in an inequitable position and from the argument presented it revolves around alleged violations of the anti-trust act, 15 U.S.C.A. § 1 et seq., restraint of trade and illegal monopoly. As to whether activities of the plaintiff, violating the anti-trust laws, would constitute a defense in a patent suit for infringement, the Courts seem to hold they would not. Radio Corporation of America et al. v. Majestic Distributors, Inc., D.C., 53 F.2d 641; Radio Corporation of America et al. v. United Radio & Electric Corporation et al., D. C., 50 F.2d 206; General Electric Co. v. Minneapolis Electric Lamp Co., D.C., 10 F.2d 851; Brown Saddle Co. v. Troxel, C.C., 98 F. 620; Trico Products Corporation v. E. A. Laboratories, Inc., D.C., 49 F.2d 404; Harms v. Cohen, D.C., 279 F. 276; Independent Baking Powder Co. v. Boorman, C.C., 130 F. 726; Western Electric Co. et al. v. Wallerstein, D.C., 48 F. 2d 268. The evidence discloses that its activities do not violate any of such laws. But defendants urge that the "patents in suit if accorded their literal scope, would effectively monopolize the manufacture, use and sale of the antirachitic factor or vitamin D in practically all substances having dietary value, such as food stuffs, as well as substances having no dietary value such as drugs." The exception to this rule where the doctrine of equity is applicable is where the plaintiff's unconscionable conduct is directly connected with the subject matter of the suit. What then is the evidence in respect to this question?

■ The plaintiff was organized in 1925 and its funds are invested to support research in the natural sciences at the University of Wisconsin, as its Articles of incorporation recite that the purpose of it "shall be to promote, encourage and aid scientific investigation and research at the University of Wisconsin by the faculty staff, alumni and students thereof, and those associated therewith, and to provide or assist in providing the means and machinery by which their scientific discoveries, inventions and processes may be developed, applied and patented, and the public and commercial uses thereof determined, and by which such utilization or ·

disposition may be made of such discoveries, inventions and processes, and patent rights or interests therein, as may tend to stimulate and promote and provide funds for further scientific investigation and research within the University or College or department thereof." The inventions covered by the patents in suit were given to the Foundation, which is run by seven trustees who are alumni of the University, by Dr. Steenbock, and the returns thereof go to the University. Licenses are issued by the Foundation which collects royalties and the control exercised by the plaintiff under the user license agreements does not relate to price or other factors which tend to restrict competition, but to such matters as control of advertising and potency. The potency control is not related to price control as the potency control protects the public, for it is assured that it is purchasing a product containing vitamin D to supply the antirachitic factor. Retaining advertising control the public is protected from false and exaggerated advertising claims as to what vitamin D will accomplish. A group of pharmaceutical or medical manufacturers are also licensed under the patents, and plaintiff cannot permit other licensees to sell products containing vitamin D potencies that these products are in effect medicines, adapted for the cure of rickets, as distinguished from food products. Consequently, in order to perform its contractual commitments with its pharmaceutical licensees it is compelled to place an upper limit upon the potency. This right of one owning a patent to limit licensees to specific fields was recognized as legitimate in the case of General Talking Pictures Corp. v. Western Electric Co., 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81. It does not fix the resale price of products made by a licensed manufacturer.

■■ At the argument the Court inquired of counsel if the recent case of Ethyl Gasoline Corporation et al. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852, was pertinent to the present suit, and from an analysis of the issues and facts there involved, it is thought not to apply as there is no similarity between the two fact situations in the present case and the Ethyl case, as the Ethyl case condemned attempts by the patent owner to maintain and control resale prices by the purchaser of the patented article. The Ethyl Corporation by its licensing system controlled the price at which the refiners would sell gasoline containing the patented fluid to the jobbers. It thereby fixed its own selling price and in effect controlled the price at which the jobber would sell gasoline to the retailer. This is what the Supreme Court condemned. There is a distinction between controlling sale price and resale price, as the owner of a patent may control the sale price by his licensee, but cannot control the resale price by his licensee's customer. United States v. General Electric Co. et al., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362. The evidence does not show that the plaintiff is carrying on any of the practices in the Ethyl case or under the authorities in general.

## Commercial Success

■■ The principle generally recognized by the Courts that the commercial success obtained which was atttributable to the discovery covered by a patent is persuasive evidence that the patent is efficient and serviceable and of the invention which is the purpose of the patent laws to reward and protect. The evidence shows that the net income yielded in royalties to the plaintiff from the patents was $5,392,466 and that the sales of the licensees have been increasing. Many licensees have acknowledged the validity of the patents and are paying royalties thereunder. These benefits are weighty evidence to sustain the presumption from the patents that what the inventor discovered was new and useful. Minerals Separation, Ltd., v. Hyde, 242 U.S. 261, 37 S.Ct. 82, 61 L.Ed. 286. Eibel Process Company, Petitioner, v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523; Morton v. Llewellyn et al., 9 Cir., 164 F. 693; Stebler v. Riverside Heights Orange Growers' Ass'n et al., 9 Cir., 205 F. 735; Research Products Co. v. Tretolite Co., 9 Cir., 106 F.2d 530; Claude Neon Lights v. E. Machlett & Son, 2 Cir., 27 F.2d 702; Cleveland Trust Co. v. Schriber-Schroth Co., 6 Cir., 92 F.2d 330; Wahl Clipper Corp. v. Andis Clipper Co., 7 Cir., 66 F.2d 162. It is fair to conclude from the evidence that the commercial success of the plaintiff is due to the discoveries of Dr. Steenbock.

## Infringement

This brings us to the consideration of whether or not the defendants have infringed the claims number 1, 2, 3, 5, 6 and 8 of plaintiff's patent No. 1,680,818, of claims 1, 2, 3, 5, 6, and 7 of patent No. 1,871,136, and claims 3 and 4 of patent No.

2,087,399 by the use of ultra violet light to activate antirachitically in accordance with the process claims covered in plaintiff's patents and by making the products of the product claims counted upon by the plaintiff. The defendants take issue with the plaintiff and upon the argument assert that the method employed by them and the products sold by them in no way infringe any of plaintiff's patents. As to whether the defendants have admitted in their answer of performing the processes and of manufacturing and selling the products patented in plaintiff's patents as urged by plaintiff requires an interpretation of paragraphs P and R of their answer, where it is stated that "with full knowledge that defendant, Vitamin Technologists, Incorporated, was spending large sums of money to perfect its methods and apparatus and to construct manufacturing facilities and to develop its business and trade and that defendant Vitamin Technologists, Incorporated, was performing the processes and manufacturing and selling the products patented in said Letters Patent Nos. 1,-680,818; 1,871,136 and 2,057,399, is now estopped from asserting its pretended right in any manner whatsoever or from invoking the power of this Court in that behalf." In paragraph R of the answer it is alleged that "the methods employed by this defendant (Vitamin Technologists, Inc.) and the products sold by it in no way infringes any of the patents in suit." These two allegations seem to contradict themselves, for in paragraph R a denial is made of infringement, while in paragraph P, where the defense of estoppel is set forth, it is admitted that the defendant corporation was performing the processes and manufacturing and selling the products covered in the patents in suit, which it has charged itself with infringement and would seem to be an admission of that fact. Whether the new rules of practice as to form of pleadings permitting "a party may also state as many separate claims or defenses as he has regardless of consistency and whether based on legal or equitable grounds, or both," should be so construed as to permit him to admit a fact and then deny it would seem to allow one to be inconsistent, as the rule relates to allowing of inconsistent legal or equitable defenses. Although it may be said that the defendants have charged themselves with infringing the patents of plaintiff, yet it becomes necessary under the rule to consider the evidence relating to defendants' opera-

tions and the processes that have been practiced by them and the products sold by defendant corporation in order to determine whether infringement existed.

The source of ultra violet light used by Dr. Steenbock was a quartz mercury vapor lamp type of medium pressure, a low temperature type as covered by its patents, and the type of the ultra violet lamp used by the defendants is a cold quartz lamp of a low pressure, a low temperature type of quartz mercury vapor lamp, and both types discharge ultra violet rays. The inquiry therefore is: Do the defendants employ as a source of ultra violet light such a quartz mercury vapor lamp which is within the scope of the claims relied upon by the plaintiff? The defendant corporation is operating under its patent of activating pro-vitamin D materials by irradiation with ultra violet rays. Are the two types of lamp different? It is not a question as to similarity in construction and operation, the types of lamps by the quartz mercury vapor lamp of the plaintiff's and the defendants' cold quartz lamp, but whether the claims of plaintiff's patents, as covered in the specifications, cover defendants' operations of the cold quartz lamp. It appears clear that the plaintiff's patents cover processes and products. The type of the apparatus is of little consequence, and it is not important what the mechanical means used to carry out the processes, "but rather whether the apparatus, no matter what its form, utilizes the process." Moore Filter Co. v. Tonopah-Belmont Development Co., 3 Cir., 201 F. 532, 542.

The variation of temperature between the process covered by plaintiff's patents and defendants' methods do not avoid infringement. American Bitumuls Co. v. Union Oil Co., supra. No difference appears between the two sources of ultra violet light in the activating effect, of wave lengths of ultra violet light in a given range. The result produced depends, not upon the particular wave length of ultra violet light or upon the light source used, but upon the pro-vitamin subjected to the ultra violet light.

As has been said, defendants use ultra violet rays and use a quartz mercury lamp under the Campsie and Johnson patents. Their products contain antirachitic potency, a substance that is able to prevent the development of rickets. They are charged with the activation of ergosterol, a pro-vitamin substance which is an or-

ganic substance of dietary value, of having food or medical value within the meaning of claims one and eight of patent No. 1,-680,818. The defendants counter the claim by contending that ergosterol is not covered by the claims and assert that "organic substances of dietary value" must be growth producing, and therefore ergosterol is not growth producing. The evidence is convincing that for a substance to be of dietary value it does not necessarily have to be growth producing as it seems to embrace, as Doctor Nelson says, "substances that are ordinarily consumed by mouth and would not be expected to produce an injury," and that ergosterol is an organic substance of dietary value. The defendants are irradiating ergosterol in ether solution which appears from the "Description of Defendant's Secret Process." The evidence shows that ergosterol is an unsaponifiable lipoid, and while present in a number of foods, never exists in nature in a separate condition, and therefore the ergosterol used by the defendants is an extract and an unsaponifiable lipoidal extract. It would seem unnecessary to recite in detail other instances in which the several processes that have been practiced by defendants and the several products that they have sold, as it will be observed from a fair proponderance of the evidence that they have infringed various of the claims of plaintiff's patents.

■ The fact that the defendants operate under the later Campsie and Johnson patents would not raise a presumption of non-infringement of the earlier patents of the plaintiff. Sanitary Refrigerator Company v. Winters et al., 280 U.S. 30, 50 S. Ct. 9, 74 L.Ed. 147; Bake-Rite Mfg. Co. v. Tomlinson et al., 9 Cir., 16 F.2d 556; French et al. v. Buckeye Iron & Brass Works, 6 Cir., 10 F.2d 257; General Electric Co. v. Cooper Hewitt Electric Co., 6 Cir., 249 F. 61. However, it appears clear by the weight of the evidence that if such presumption did exist it is rebutted by the evidence as the claims relied on as to process and product have been infringed by the defendants.

### The Individual Liability of the Defendant Roessler

■ The allegation in the complaint as to infringement by the defendants is that they jointly and severally willfully infringed and that they have been notified in writing of their infringement. The authorities are not in accord respecting the liability of officers, stockholders and employees of a private corporation for its infringements. They may be enjoined whenever necessary to protect the patentee against future infringement is universally conceded, but they cannot be held in damages for past infringement when they act merely as officers and within the scope of their official duties, and do not act *willfully* and knowingly personally participate in the corporation's infringement, or use the corporation as an instrument to carry out their *willful* and deliberate infringement, or use an *insolvent* corporation to avoid personal liability, or if the rule is adopted as claimed to have been established by the Ninth Circuit Court of Appeals in the case of Zell v. Bankers' Utilities Co., Inc., 9 Cir., 77 F.2d 22, that a corporate officer is not responsible for the corporation's infringing profits unless he is shown to have inflicted the wrong while acting beyond the scope of his authority or a showing as to insolvency of the corporation, or fraud, as the members are merged in the corporate body and the corporation becomes a legal entity distinct from its members and its officers, and acts through its members as a corporate body and the acts of its officers are regarded as the acts of the legal entity as distinguished from the members who compose it.

With these two thoughts as to liability in mind, we analyze the evidence to ascertain if the acts of the defendant Roessler come within either one of them, for if not, it would make no difference which one should be adopted.

■ The defendant corporation was organized on March 23, 1934, and is existing under the laws of the State of California, with a capitalization of one thousand shares of common stock of no par value. There was issued five hundred; two hundred and fifty and two hundred and fifty shares to the incorporators, Roessler, Campsie and Chesney respectively. The business of it and its predecessor, the Chesney Foundation, has been conducted by practical men in the vitamin field. In November, 1934, and May 27, 1941, the defendant corporation had issued to it two patents under which it claimed the right to manufacture vitamin D, and it and the defendant Roessler, when in acting for the corporation, sought and secured the advice of prominent and experienced counsel to the effect that neither its process nor its

product infringed any of the patents in suit. Roessler was the secretary-treasurer and Johnson the president of the defendant corporation, and Roessler was active in the affairs of the company, and has, at times, advanced money to it, which seems not to be uncommon for one to do in companies of the magnitude of the defendant corporation, as it is, as one may say, a small concern with little assets. The principal nature of the work was in the vitamin field. It has acquired laboratory equipment to carry out its work, and its net income at times became small. The fact that he, on behalf of the company, which claims to have been operating under its patents, consulted attorneys as to whether its patents authorized it to operate in the manner it did, and whether it was infringing plaintiff's patents, and knew of plaintiff's licensing system and of infringement litigation and was active in assisting it and advanced money to it would not bring him within either of the rules thus stated, for such acts, when applied to an officer or stockholder of a corporation, do not satisfy either the rule of acting willfully, or was using the corporation to carry out his own willful and deliberate infringement, or was using an irresponsible or insolvent corporation, or inflicted a wrong while acting beyond the scope of his authority, or acted fraudulently. Taking the evidence as a whole, one cannot say that he individually acted in bad faith, for he did just what he in good faith thought was the legal right of the defendant corporation, after being advised by counsel that the defendant corporation was not infringing plaintiff's patents, for, as said, he wanted to know just what were the legal rights of the company and whether it was infringing plaintiff's patents. Such cautious steps would remove any thought of willfulness, and could not under any process of reasoning be construed to be willful or acting beyond the scope of authority to make him jointly liable with the defendant corporation.

In view of what has been said as disclosed by the evidence, the patents of the plaintiff are valid, and have been infringed by the defendants, who are each enjoined from further infringement, and for an accounting to be made by the defendant Vitamin Technologists, Inc., for profits and damages, if any, with costs, and findings of fact and conclusions of law to that effect will be made. Solicitors for plaintiff will present and serve findings, conclusions and decree.